UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DUTKIEWICZ, et al *Plaintiffs* | : : : | CIVIL ACTION NO. 3:03-CV-109(AVC) |
| v. | : : | |
| RAINBOW IN A TEAR, et al *Defendants* | : : | NOVEMBER 25, 2003 |

### STATE DEFENDANTS' FILING OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION TO DISMISS

The State Defendants hereby proffer supplemental authority in support of their motion to dismiss. Accompanying this notice is the November 12, 2003 decision in <u>Carroll v. Ragaglia</u>. The issues raised and decided in the <u>Carroll</u> litigation are similar to the issues raised herein, and thus the state defendants submit the <u>Carroll</u> decision to assist the Court's consideration of their motion to dismiss.

                                              DEFENDANTS, DEPARTMENT OF
                                              CHILDREN AND FAMILIES, OFFICE OF
                                              THE ATTORNEY GENERAL, and
                                              NAMED STATE EMPLOYEES in their
                                              official and individual capacities

                                              RICHARD BLUMENTHAL
                                              ATTORNEY GENERAL

BY: _____/s/ Clare E. Kindall_____
                                              Clare E. Kindall
                                              Assistant Attorney General
                                              Federal Bar No. ct13688
                                              55 Elm Street
                                              P.O. Box 120
                                              Hartford, CT  06141-0120
                                              Tel: (860) 808-5020
                                              Fax: (860) 808-5347
                                              Clare.Kindall@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing state defendants' filing of supplemental authority was served in accordance with Rule 5(b) of the Federal Rules of Civil Procedure by first-class mail, postage prepaid on this 29th day of May, 2003 to:

Thomas Dutkiewicz, pro se
Aimee Dutkiewicz, pro se
32 Terryville Avenue, 3rd Floor
Bristol, CT 06010

Bonnie Maskery, pro se
16 Minnesota Lane
Bristol, CT 06010

Patrick M. Fahey, Esq.
Shipman & Goodwin, LLP
One American Row
Hartford, CT 06103

Thomas R. Gerarde, Esq.
Alexandria L. Voccio, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

Katherine C. Callahan, Esq.
Updike, Kelly & Spellacy, P.C.
One State Street, P.O. Box 231277
Hartford, CT 06123-1277

                                                                                                               _____
                                                                                                               Clare E. Kindall
                                                                                                               Assistant Attorney General

ruling

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THOMAS J. CARROLL,
Plaintiff,

-vs-

KRISTINE D. RAGAGLIA, et. al.,
Defendants.

: Civ. No.3:02cv790 (PCD)

FILED
Nov 12  10 18 AM '03
U.S. DISTRICT COURT
NEW HAVEN, CONN

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Kristine D. Ragaglia, Judith Fritz, and Laura Curran move for summary judgment on all counts.[1] For the reasons stated herein, Defendants' motion is granted.

### I.  Background[2]

In July, 1998, the child John Doe[3], a special needs child with behavior problems, was removed from his birth mother's care and was placed by DCF as a foster child in with Plaintiff, who was his primary caregiver.

From August, 1997 through March, 2003, Ragaglia was Commissioner of the Department of Children and Families (DCF). Plaintiff attended informational meetings in 1999 at which Ragaglia was a speaker, and telephoned Ragaglia to complain about the DCF New Britain office and its poor handling of the child.[4]

---

[1] Although Plaintiff named Dawn Doty (former DCF social worker) as a Defendant, she has not been served and has not appeared. Accordingly, all claims against her are dismissed.

[2] Facts are taken from the parties' Local Rule 56(a) statements, and are undisputed unless stated otherwise.

[3] Pursuant to the Court's endorsement granting the parties joint motion for confidentiality, the child is referred to as "John Doe" or "the child." See Doc. No. 23.

[4] Plaintiff provides no details regarding when call...

In 2000, Curran was employed as an investigative social worker, assigned to investigate reports of suspected child abuse or neglect reported to the DCF hotline. Curran's first contact with Plaintiff was on October 10, 2000. Fritz, a treatment social worker, was assigned to the child's case in May, 2000. Foster and Adoption Services Unit (FASU), a different DCF unit than Fritz's unit, was responsible for foster parent training, licensing, and for primary support of assigned foster homes. Curran and Fritz were trained by DCF, as were Plaintiff and his wife. Plaintiff alleges that such training was inadequate, and did not include training on Reaction Attachment Disorder ("RAD"). Plaintiff self-studied RAD.

After assignment to the child's case, Fritz learned of the child's diagnosis of RAD. Plaintiff contends Fritz did not understand RAD and was not interested in learning about it. Defendants contend that she consulted various resources to familiarize herself with the condition. Fritz attempted to alleviate stress within the foster home, including respite care at various times. As of August, 2000, Plaintiff had no complaint against Fritz.

Plaintiff's wife complained to the Office of the Child Advocate ("OCA"), an independent state agency which investigates complaints concerning actions of state agencies providing services to children, regarding DCF's handling of the child's case. She left messages with an unidentified OCA secretary, but no one spoke with her directly. An Assistant Child Advocate wrote to Plaintiff's wife on September 19, 2000, stating that DCF's narrative case reports had been reviewed and that DCF's actions were found appropriate to the child's needs.

On October 10, 2000, DCF received a report on its hotline of suspected child abuse concerning the child. The school social worker at his elementary school reported that she and the school nurse observed marks on the child's neck and arm. Although initially the child told her that he did not recall how he got the marks, he later stated that he had a conflict with his foster

2

father (Plaintiff) about cleaning his room the previous evening. The child stated that Plaintiff grabbed his neck and arm and possibly placed his hands on the child's face. The social worker noted that the child had a mark on his neck approximately three inches by one inch, which had broken blood vessels, was reddish-brown in color, and resembled a rope burn. The report indicated that there were marks under the child's eyes, and that he was a special education student diagnosed with attention deficit disorder and was on medication.

On October 10, 2000, Curran was assigned to investigate the report of abuse. The school social worker told Curran that she brought the child to the school nurse after observing red marks on his neck. Curran learned that the school nurse had called Plaintiff earlier that day and Plaintiff told her that he had not noticed any marks on the child but that it had been a "rough weekend." The foster parents reported to the school that the child had difficult behavior problems at home. Curran called Fritz, the treatment social worker, seeking additional background information, and was told that the child is difficult to manage and has attachment disorder and a tendency to fabricate. Fritz also told Curran of a report by Plaintiff that the child falsely stated that Plaintiff had hit him in a grocery store. Fritz advised Curran that Plaintiff and his wife were dissatisfied with DCF's handling of the case.

On October 10, 2000, Curran visited the child's elementary school and interviewed the child alone in the school social worker's office. She noticed bruises and marks on the child. The child told Curran that Plaintiff had applied physical force to him during an argument the previous evening over cleaning the child's room.

This same day Curran visited Plaintiff's home and informed Plaintiff of the concern regarding the physical marks on the child's face and neck. Plaintiff became frustrated about the situation. Defendants allege that Plaintiff attempted to call the child's therapist, Marguerite

3

Ruppenicker. Plaintiff alleges that Ruppenicker called Plaintiff during Curran's visit. Plaintiff alleges that Curran refused to speak with Ruppenicker, and that Curran requested Plaintiff to stay off the phone so Curran and Plaintiff could discuss the situation. Plaintiff told Curran that the child had a temper tantrum the previous evening and was flailing around, and that the next morning he had to physically put the child in the shower because the child refused to clean himself. Plaintiff advised that the child had a cut on his foot and that Plaintiff put alcohol on the wound. Plaintiff kept repeating that he knew that this was going to happen, because of the child's tendency to lie and accuse people of hurting him when he does not get his way.[5]

Later this day Fritz arrived at Plaintiff's home and was present when the child returned from school. According to Plaintiff, the child arrived home and ran to Curran to show her more marks, which Curran identified as old marks. According to Defendants, Plaintiff immediately told the child to come to him so he could observe the child's neck. When Plaintiff asked the child what happened, the child indicated that Plaintiff had pulled on his neck the previous night.

---

[5] Plaintiff and Defendants dispute the facts of the October 9, 2001 altercation between Plaintiff and the child. In their Local Rule 56(a) statement, Defendants indicate that the child told Curran that
> [Plaintiff] grabbed [the child] by his neck and dragged him to his bedroom. He stated that [Plaintiff] choked him with his hands and also by pulling up on the back of his shirt . . . [and that Plaintiff] put his hands over [the child's] mouth to stop him from yelling. [The child] also reported that [Plaintiff] held him face down on the ground. [The child] reported that he could not breathe and his head started to hurt. . . . [The child] said he did not know how he got the marks under his eyes, on his cheek or his arm, but he thought they happened the evening of October 9th.

Def. Local Rule 56(a) Statement ¶ 18.
Plaintiff offers a different account of events, indicating that he had told Curran
> that he had to take off [the child's] clothes and put him in pajamas because [the child] refused to do it himself. During that time, [the child] was having a serious temper tantrum and was flailing himself around and kicking things. [He] also explained that the next morning he had to physically put [the child] in the shower because he would not clean himself.

Pl. Local Rule 56(a) Statement ¶ 21. Defendants allege that during his conversation with Curran Plaintiff indicated that the child put his pajamas on after initially refusing, and went to bed; Plaintiff denied causing any marks on the child's neck and did not know how the child got the marks. Def. Local Rule 56(a) Statement ¶ 21.

4

Defendants allege that Plaintiff and the child accused each other of lying and that Plaintiff directed the child to go to his room.

This same day, the police were contacted about the incident,[6] and State Trooper Derek Allen, who had previously investigated a complaint that Plaintiff's wife struck the child with a wooden spoon in February of 2000, arrived at Plaintiff's home and interviewed the child in Curran's presence. Defendants allege that the child told Allen "substantially the same account" of the incident, and Plaintiff alleges that the child's story was different from the one told to Curran or the school nurse. Allen also interviewed Plaintiff alone in the squad car.

Later in the day Fritz took the child to an emergency room for examination. The emergency room physician called the DCF hotline to report suspected abuse, and the emergency room report reflected that the child had a bump on his head, bruising, petechiae[7] on his neck and under his eyes (indicative of choking), and finger marks on his right cheek and left forearm. Two physicians examined the child and diagnosed physical abuse. Plaintiff alleges that the emergency room physicians were not told about the child's diagnosis of RAD or his history of making false allegations of child abuse.

On October 12, 2000, Ruppenicker told Curran that she suspected the child had RAD, and that he accuses his foster parents of abuse when he does not get what he wants. Ruppenicker did not have any concerns about abuse or inappropriate discipline in Plaintiff's home, but she was aware that Plaintiff's wife once hit the child with a wooden spoon. Ruppenicker opined that

---

[6] Defendants allege that Linda Madigan Runlett, Curran's supervisor, contacted the police. Plaintiff alleges that Curran called the police.

[7] Petechiae is "a small red or purple spot in the skin caused by extravasation [escape] of blood." Oxford English Dictionary.

5

DCF did not sufficiently train Plaintiff and his wife. Plaintiff alleges that Ruppenicker also told Curran that the child could injure himself during tantrums.

This same day Curran was informed by the child's pediatric group that a chart dated January 28, 1999 stated that the foster parents were concerned about the child's lying and aggressiveness. The chart did not indicate any neglect or abuse. Curran also called the school nurse.

Pursuant to DCF policy, at the conclusion of an investigation the investigator is required to consult with her supervisor to determine whether the report of abuse or neglect is substantiated or unsubstantiated. Defendants allege that physical abuse was found to be substantiated on or about October 16, 2000. Plaintiff alleges that the decision to substantiate was made the same day abuse was reported.

During the course of these events, Plaintiff repeatedly noted the child's history of lying. While Curran was aware that the child had exaggerated or lied, DCF records demonstrate that the child accurately reported to DCF at least two specific incidents. One incident involved Plaintiff's wife striking the child with a wooden spoon because he was throwing snowballs at horses.[8] Plaintiff's wife was criminally charged by state police as a result. The other incident involved Plaintiff's wife putting soap in the child's mouth, to which she admitted.

As an investigative social worker, Curran was not involved in the provision of services or support to Plaintiff's foster home or treatment services to the child. Neither Curran nor Fritz were involved in scheduling the administrative hearing.

---

[8]   A neighbor had reported that Plaintiff's wife hit the child with an object that appeared to be a wooden spoon. Defendants allege that she "struck" the child on his hand with the spoon, while Plaintiff alleges that she "tapped" his hand.

6

On or about October 10, 2000, Plaintiff retained attorney James A. Wade to represent him. At the end of October, 2000, Wade met with the prosecutor on Plaintiff's behalf and advised the prosecutor of the child's RAD diagnosis and his propensity to lie. Wade encouraged the prosecutor to speak with the child's therapist, psychiatrist, attorney and former attorney, the Connecticut Association of Foster and Adoptive Parents, Inc., and school teacher.

On or about October 17, 2000, DCF notified Plaintiff that he had been substantiated as an abuser. Plaintiff demanded an appeal of the substantiation. On or about October 26, 2000, DCF provided "Notification of Investigation Review Results" which stated that the substantiation was upheld. Plaintiff's attorney's requested an administrative hearing to challenge the determination. A paralegal in DCF's Administrative Hearings Unit sent Wade a letter scheduling an administrative hearing on January 22, 2001, to be held in accordance with the Uniform Administrative Procedures Act, CONN. GEN. STAT. §§ 4-177 through 4-181, and DCF Policy §§ 22-12-1 through 22-12-8. After the hearing began, Plaintiff learned that State Trooper Derek Allen had left his photographs of the child's bruises at the office. Plaintiff's request for a continuance was granted, and the hearing was continued to February 23, 2001.

On or about January 29, 2001, Plaintiff was arrested in connection with the October 9, 2001 incident and charged with assault in the third degree and risk of injury to a minor. After learning of the arrest, the hearing officer notified Plaintiff's attorney that the upcoming hearing would be deferred pending disposition of criminal court proceedings related to the alleged abuse being reviewed in the administrative proceeding. The letter stated that "[u]pon resolution of the court proceeding, you may request to reactivate your hearing request by sending a letter, and any necessary documentation relative to the adjudication of the [criminal] charges" to the Director of the Division of Administrative Law and Policy ("the Director of ALP"). Attorney Wade

7

protested the hearing officer's decision, and wrote that "[t]he Department's conduct is an example of arbitrary and capricious administrative action without statutory or regulatory authority." In response, the Director of ALP wrote Wade stating that "your objection to the decision is noted and it is made a part of the record."

On September 12, 2001 the criminal charges were dismissed. In arguing for dismissal, Wade represented that "[o]ne of the reasons we're asking for a dismissal is that under the State's system there is an administrative proceeding that is on-going [and that] involves [Plaintiff's] name being listed [on the child abuse registry]. . . and we intend to take such steps as necessary to have that erased as well." Plaintiff neither commenced a Superior Court action for that purpose nor sought a continuation of the hearing, but instead filed this suit.

Count One of Plaintiff's complaint alleges Defendants intentionally inflicted emotional distress and were "wanton, reckless, and malicious" in that (1) Plaintiff was substantiated as a child abuser without a hearing and without due process; (2) DCF's policies and procedures regarding the investigation of the October 9, 2000 incident violated Plaintiff's rights guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, §§ 7, 8, and 9 of the Connecticut Constitution; (3) DCF and Defendants failed to keep adequate records; (4) DCF and Defendants did not provide adequate support to Plaintiff; (5) DCF and Defendants put Plaintiff's name on a child abuse registry without due process of the law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, §§ 7, 8, and 9 of the Connecticut Constitution; (6) DCF and Defendants referred the matter to the Connecticut State Police and consequently Plaintiff was arrested and charged with criminal conduct; (7) DCF and Defendants discriminated against Plaintiff despite his good record and the child's tendency to lie; (8) Defendants acted in excess of their statutory authority as DCF officials; and (9) the

8

accusations made by DCF and Defendants that Plaintiff was a perpetrator of child abuse are libelous and made without due process of law.

Count Two alleges that Defendants' actions constituted an abuse of process and vexatious litigation.

Count Three alleges that Defendants' actions violated Plaintiff's rights under 42 U.S.C. § 1983 in that (1) they violated Plaintiff's Fourteenth Amendment right to procedural due process; (2) Defendants' behavior shocks the conscience; (3) they interfere with Plaintiff's ability to pursue a career in child care in violation of his Fourteenth Amendment right to due process; (4) they violated his Fourth Amendment right to be free from unreasonable searches and seizures.

Count Four alleges that Defendant's actions violated Plaintiff's rights under Article I §§ 7, 8, and 9 of the Connecticut Constitution for the same reasons cited in support of Count Three.

Count Five alleges that Plaintiff was slandered, libeled, and defamed by Defendants.

Plaintiff seeks money damages, punitive and exemplary damages, court and administrative costs and attorneys' fees, a mandatory injunction ordering Defendants to expunge all DCF records relating to the October 9, 2000 incident, and a jury trial.

II.    Standard

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In determining whether a genuine issue has

9

been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). Summary judgment is proper when reasonable minds could not differ as to the import of evidence. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & H. R. Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir. 1990). Determinations as to the weight to accord evidence or credibility assessments of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

### III. Discussion

#### A. Absolute Immunity

Defendants argue that to any extent Plaintiff contends that Defendant Curran is liable for determining that Plaintiff perpetrated physical abuse, she is protected by absolute immunity. Def. Mem. in Supp. of Summ. J. at 26. Plaintiff argues that Defendants are not entitled to absolute immunity as they did not act as a prosecutors or judicial officers. Pl. Opp. at 20.

Judges and prosecutors are cloaked with absolutely immune from liability for damages based on actions taken in furtherance of their judicial or prosecutorial duties. However, "'immunity is justified and defined by the functions it protects and serves, not by the persons to whom it attaches.'" *Gyadu v. Workers' Comp. Comm'n.*, 930 F. Supp. 738, 748 (D. Conn. 1996) (citing *Forrester v. White*, 484 U.S. 219, 227, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988)). "Accordingly, absolute immunity protects officials from liability for actions which are functionally comparable to those of judges and prosecutors." *Moran v. Connecticut Dep't. of Pub. Health & Addition Servs.*, 954 F. Supp. 484, 489 (D. Conn. 1997). "Because qualified

10

immunity is presumed to be sufficient to protect public officials in the exercise of their discretionary duties, *see Burns v. Reed*, 500 U.S. 478, 486-87, 114 L. Ed. 2d 547, 111 S. Ct. 1934 (1991), absolute immunity extends only so far as necessary to protect the judicial process." *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995).

"The investigation of charges of child abuse and the removal of a child from its parents' custody is accorded only qualified protection." *Hill*, 45 F.3d at 661 (citing *Robison v. Via*, 821 F.2d 913, 918-20 (2d Cir. 1987)). "[A]dvising the police during the investigative stage of a case that they have probable cause to arrest [is] an advocacy function." *Id.* (citing *Burns*, 500 U.S. at 493). Accordingly, Defendants are not entitled to absolute immunity for actions in the investigative phase, including communications which may have contributed to the police finding probable cause to arrest Plaintiff.

### B.    Section 1983 Claims (Count Three)[9]

Count Three alleges that Defendants deprived Plaintiff of his rights under 42 U.S.C. § 1983 in that Defendants' actions (1) violated his Fourteenth Amendment right to procedural due process; (2) "constituted a gross abuse of power that is shocking to the conscience;" (3) impeded and continue to impede his ability to pursue a career in child career pursuant to the Fourteenth Amendment; and (4) violated his Fourth Amendment right to be free from unreasonable searches and seizures. Defendants argue that they are entitled to summary judgment on Count Three because (1) they had no personal involvement in these actions, and (2) they are cloaked with qualified immunity because Curran and Fritz's actions were objectively reasonable, and because

---

[9]  Because "a violation of state law is not cognizable under § 1983," *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985), the federal law doctrine of qualified immunity does not apply to state law claims, and accordingly the qualified immunity defense is construed as a defense against Count Three of Plaintiff's complaint.

11

there was no violation of a clearly established constitutional right. Plaintiff responds that Defendants were personally involved and that the constitutional rights violated by Defendants were sufficiently clear to preclude summary judgment.

### 1. Personal Involvement of Defendants

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation and citations omitted). A defendant cannot be held personally responsible merely because of his or her high position of authority. *See id.* Supervisor liability in a § 1983 action depends on a showing of some personal involvement, and cannot rest on *respondeat superior*. *See Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989). Supervisor liability can be shown in the following ways:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

#### a. Defendant Ragaglia

Defendants argue that Defendant Ragaglia had no personal involvement in the conduct of which Plaintiff complains. Def. Mem. for Summ. J. at 7. Plaintiff does not respond directly to this argument. *See* Pl. Opp. at 29-30 (arguing Fritz and Curran's personal involvement without addressing Ragaglia). Elsewhere, Plaintiff alleges that he attended informational meetings where Ragaglia was a speaker, left phone messages for her, and wrote her a letter once. For example,